**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Annette M. Trnka,

Plaintiff,

Civ. No. 07-1206 (RHK/JSM)
**MEMORANDUM OPINION AND ORDER**

v.

Biotel Inc. and Braemar, Inc.,

Defendants.

---

Paul O. Taylor, Taylor & Associates, Ltd., Burnsville, Minnesota, for Plaintiff.

Mark S. Mathison, Ugo A. Ukabam, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, Minnesota, for Defendants.

---

In this action, Plaintiff Annette Trnka has sued her former employer, Braemar, Inc. ("Braemar"), and its parent company, Biotel, Inc. ("Biotel"), alleging that Braemar engaged in disability discrimination when it terminated her employment.[1] Currently pending before the Court is Defendants' Motion for Summary Judgment. For the reasons set forth below, the Court will grant the Motion.

**BACKGROUND**

Defendants manufacture medical devices and provide medical software and research services. (Erickson Aff. ¶ 4.) On May 22, 2006, Trnka began working for Defendants as a

---

[1] For ease of reference, the Court refers to Braemar and Biotel collectively as Trnka's employer and as "Defendants."

sales administrator. (Id. ¶ 8.) In that role, she took over certain administrative tasks previously performed by her supervisor, Louise Litman, so that Litman could focus exclusively on selling Defendants' products. (Trnka Dep. Tr. I at 37; Ukabam Aff. Ex. 4.)[2]

On July 25, 2006, Trnka was injured at work when she was struck by a door that unexpectedly flew open, knocking her to the floor. (Trnka Dep. Tr. I at 26-27.) The impact caused Trnka to suffer "an instant migraine," as well as scraping and bruising of her wrists and neck pain. (Id. at 27.) Because Litman was on vacation at that time, Trnka went to the office of Renee Erickson, who worked in Defendants' human-resources department, and showed Erickson her injuries; she requested that she be allowed to leave to see a doctor. (Id.) Erickson told Trnka that she could not leave because the only other sales-department employee at work that day was in a meeting and, hence, no one would be able to handle sales calls in her absence. (Id.) Trnka became very upset and told Erickson that she quit; she then left the building and went to an urgent-care clinic. (Id. at 28-30.)

Later that evening, Erickson telephoned Trnka and left her a message on her answering machine. (Id. at 30.) Erickson stated that she thought that Trnka had misunderstood her, and she apologized for the "confusion" and expressed her hope that Trnka would return to work the next day. (Id. at 30-31.) Trnka was "relieved" that Erickson had "overlooked [her] emotional outburst," and she did, in fact, return to work the following day, although she left early because she was not feeling well. (Id. at 31.)

---

[2] The transcript of Trnka's deposition is split into two volumes, identified as "Trnka Dep. Tr. I" and "Trnka Dep. Tr. II."

That evening, Trnka received a telephone call from the urgent-care clinic informing her that a radiologist had reviewed the x-rays of her wrist and discovered a fracture. (Id. at 33.) Trnka advised Litman (who by then had returned from vacation) that she would be late to work the following morning so that she could have her wrist placed in a splint. (Id. at 33-34.) Once her wrist was splinted, Trnka returned to work; her physician placed no restrictions on her working at that time. (Id. at 34.) Trnka's wrist was splinted for approximately five to six weeks and is now completely healed. (Id. at 16, 176-77.)

The migraine resulting from Trnka's workplace injury, however, proved more troublesome than the wrist fracture. Indeed, Trnka suffered from the migraine "constantly" from the date of her injury through December 2006, although it varied in intensity. (Id. at 17-18, 177.) She was prescribed several different medications that helped to ameliorate, but not totally eliminate, the migraine's symptoms. (Trnka Dep. Tr. II at 142-43.) Notwithstanding her constant headache, Trnka remained able to work full time by "focus[ing] on getting the work done" – in her words, she simply "pulled up [her] socks and went forward." (Id. at 135-37.) None of Trnka's treating physicians indicated that she could not (or should not) return to work. (Id. at 139, 143, 145, 149-59; Ukabam Aff. Ex. 6 at D0097.) The migraine finally disappeared in April 2007. (Trnka Dep. Tr. I at 16-17.)

In the weeks following her injuries, Trnka attended several doctors' appointments, many of which took place during the work day; in all, she missed over 75 hours of work to attend those appointments. (Id. at 206-07.) With the exception of one week of absences discussed in more detail below, Defendants paid Trnka for all of the time that she missed.

(Id.) Trnka, however, perceived that Litman became "hostile" toward her for missing so much work time, based on her observation that Litman frequently would not look at her during their conversations and because Litman's responses to her questions "were very clipped." (Trnka Dep. Tr. I at 51-52.)

On August 21, 2006, Erickson e-mailed Trnka regarding her absences. (Ukabam Aff. Ex. 6 at D0100.) Erickson noted that Trnka had missed work on several occasions to attend doctors' appointments, and she "request[ed]" that Trnka's future appointments "be made early in the morning, during [her] lunch break or late in the afternoon, to minimize missed hours of work." (Id.) Although Trnka believed that Erickson's request was "reasonable," she took exception to the e-mail because, in her view, it suggested that she had not previously been trying to obtain medical appointments during non-working hours. (Trnka Dep. Tr. I at 83-85.) Trnka responded to Erickson's e-mail the following day, stating her "appreciation" for the "support" Defendants had given her and indicating that she would "continue to seek appointments which would be better suited to work hours." (Ukabam Aff. Ex. 6 at D0099.)

The following morning, Trnka e-mailed Litman and Erickson from home and informed them that her doctor had told her not to work for the remainder of the week. (Id. at D0098.) On the following Monday, August 28, 2006, Trnka again e-mailed Litman and Erickson and informed them that she would not be coming to work that day or the next day because her doctor had "taken her off of work." (Id. at D0096.) Trnka returned to work on August 30, 2006, without restrictions. (Trnka Dep. Tr. II at 139.) Then, on Monday,

September 11, 2006, Trnka was suddenly admitted to the hospital as a result of her continuing migraine. (Ukabam Aff. Ex. 9.) She was discharged on September 14, 2006, with instructions not to return to work until the following Monday, September 18, 2006. (Id. Ex. 10.)

During Trnka's hospitalization, Litman accessed Trnka's work e-mail to see if there were any business-related messages that needed attention in her absence. (Litman Aff. ¶ 4.) She discovered what she felt were an "unreasonable" number of personal e-mails on Trnka's work computer, including some with sexual or otherwise inappropriate content. (Id. ¶ 5.) Litman also discovered e-mails indicating that Trnka was dissatisfied with her job with Defendants and that she was actively seeking employment elsewhere during working hours. (Id. ¶ 9.)[3]

Once Litman discovered these e-mails on Trnka's work computer, Defendants assigned Erickson the task of analyzing Trnka's e-mail in detail. (Erickson Aff. ¶ 15.) Erickson's analysis revealed several e-mails with "dirty talk, dirty jokes, and sex-related graphics," and she concluded that Trnka was "occupying an inordinate amount of her workday" sending personal e-mails, rather than performing business-related tasks. (Id.

---

[3] By way of example, Trnka sent an e-mail to a friend on September 6, 2006, stating "I am still looking to get out of here. At least at Dart [Trnka's prior employer] I loved what I was doing and the people I worked with. Here I HATE waking up every day. I dread coming here and I hate what I'm doing every minute I'm here. The people are no fun and the work is so tedious and my boss looks over my shoulder every hour to see what I'm working on. I just hate that." (Ukabam Aff. Ex. 2 at D0131.)

¶ 19.) Erickson then prepared a summary of Trnka's e-mail usage and presented it to Harry Strandquist, Defendants' CEO. (Id. ¶ 21.)

On Monday, September 18, 2006, Trnka returned to work. (Trnka Dep. Tr. I at 66-67.) Sometime that day, Trnka met with Erickson and Litman, who asked her "what your doctor's prognosis is, what you think will be happening from here on, and what we can expect for your attendance to be." (Id. at 67.) Trnka interpreted the questions as a complaint about her attendance. (Id. at 67-69.) She told Erickson and Litman that the prognosis for her migraine was unknown and that she did not know when it would resolve. (Trnka Dep. Tr. II at 109-10, 114-15.) Also at that meeting, Erickson told Trnka that she had learned that workers' compensation would pay for 32 hours of work time that Trnka had missed the previous week due to her hospitalization; because Defendants had already paid Trnka for that time, however, Erickson told Trnka that 32 hours' worth of pay would be deducted from her next paycheck and that she should seek to recover the deducted amount from workers' compensation. (Trnka Dep. Tr. I at 69-71; Erickson Aff. ¶ 23.)

Later that day, Litman met with Trnka concerning her use of company e-mail. (Litman Aff. ¶ 15.) Litman told Trnka that she had discovered some inappropriate e-mail on Trnka's work computer and that the e-mail violated company policy and must stop immediately. (Id.) A few days later, on September 20 or 21, 2006, Strandquist, Erickson, and Litman made the decision to terminate Trnka's employment as a result of her inappropriate use of company e-mail. (Erickson Aff. ¶ 24.) She was fired on September 22, 2006. (Id. ¶ 26.)

On December 19, 2006, Trnka filed a charge of discrimination with the Minnesota Department of Human Rights and the EEOC, alleging that Defendants had terminated her employment due to their perception that she was disabled by her ongoing migraine. (Compl. ¶ 7; Ukabam Aff. Ex. 13.) She received a right-to-sue letter dismissing her charge on January 24, 2007. (Compl. Ex. B.) On February 15, 2007, Trnka commenced the instant action in Minnesota state court, which Defendants subsequently removed to this Court. In her Complaint, Trnka alleges that Defendants discriminated against her when they terminated her employment based on their perception that she was disabled, in violation of the Minnesota Human Rights Act ("MHRA"), Minnesota Statutes §§ 363.01-363.15 (Count 1), and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213 (Count 2). Trnka also alleges that Defendants terminated her employment in retaliation for seeking workers' compensation benefits, in violation of Minnesota Statutes section 176.82 (Count 3). Defendants now move for summary judgment on each of these claims.[4]

**STANDARD OF REVIEW**

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material

---

[4] In her Opposition brief, Trnka has nowhere addressed Defendants' arguments concerning her retaliation claim (Count 3). The Court, therefore, deems that claim abandoned and will only address herein Trnka's discrimination claims (Counts 1 and 2). See, e.g., A.C. ex rel. M.C. v. Independent Sch. Dist. No. 152, Civ. No. 06-3099, 2006 WL 3227768, at *4 (D. Minn. Nov. 7, 2006).

facts in the case are undisputed. Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**ANALYSIS**

Trnka alleges that her termination violated both the ADA and the MHRA. The disability-discrimination provisions in the MHRA "mirror" the ADA, however, and courts analyze claims under both statutes in the same way, utilizing the tripartite burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). E.g., Heaser v. Toro Co., 247 F.3d 826, 830 n.2 (8th Cir. 2001); Wilking v. County of Ramsey, 153 F.3d 869, 872 (8th Cir. 1998). Under that framework, a plaintiff must first establish a *prima facie* case of discrimination, which requires the plaintiff to show that she (1) is disabled, (2) is qualified to perform the essential functions of her job, with or without reasonable accommodation, and (3) suffered an adverse employment action because of her disability. E.g., Rask v. Fresenius Med. Care N. Am., __ F.3d __, 2007 WL 4258620, at *1 (8th Cir. Dec. 6, 2007); Napreljac v. John Q. Hammons Hotels, Inc., 505 F.3d 800, 804

(8th Cir. 2007). If the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. E.g., Dovenmuehler v. St. Cloud Hosp., __ F.3d __, 2007 WL 4233160, at *3 (8th Cir. Dec. 4, 2007); Wilking, 153 F.3d at 872-73. If the employer does so, the plaintiff must then establish that the proffered reason is a pretext for discrimination. Dovenmuehler, 2007 WL 4233160, at *3; Wilking, 153 F.3d at 873.

Here, the Court assumes *arguendo* that Trnka has established a *prima facie* case of disability discrimination.[5] Defendants have satisfied their burden of articulating a legitimate, nondiscriminatory reason for the termination of Trnka's employment: her

---

[5] Where, as here, an employer has articulated a legitimate, nondiscriminatory reason for an adverse employment action, a district court "may skip the analysis of a plaintiff's *prima facie* case and proceed directly to the evaluation of pretext." Adelman-Reyes v. Saint Xavier Univ., 500 F.3d 662, 665 (7th Cir. 2007). Nevertheless, the Court has serious doubts about whether Trnka has actually established a *prima facie* case. To do so, she was required to show that she is "disabled," *i.e.*, that (1) she suffers from a physical or mental impairment that substantially limits one or more of her major life activities, (2) she has a record of such an impairment, or (3) Defendants regard her as having such an impairment. 42 U.S.C. § 12102(2); see also Minn. Stat. § 363A.03, subd. 12 (requiring a "material" impairment instead of a "substantial" impairment). Trnka proceeds on the third prong, positing that Defendants regarded her as being unable to perform customer-service work due to her continuous migraine headache (see Mem. in Opp'n at 15-17), but the record does not appear to support that conclusion. Indeed, Trnka continued working at her job (without any restrictions from her treating doctors) despite her ongoing migraine headache, and she has acknowledged that she was able to perform all of her job duties, migraine notwithstanding. (Trnka Dep. Tr. II at 190-91.) She further admits that she never requested any type of accommodation from Defendants and that she never received any complaints or criticism about her performance. (Id. at 191; Trnka Dep. Tr. I at 66, 162.) The most Trnka can point to in order to show that Defendants regarded her as disabled is that Erickson and Litman "interrogated" her on September 18, 2007 – the day she returned to work after being hospitalized – about the future prognosis of her migraine. For the reasons discussed below, however (see infra at 13-14), no reasonable jury could conclude that Erickson's and Litman's questioning of Trnka on that day evinces a discriminatory motive.

improper use of company e-mail. To survive summary judgment, therefore, Trnka must proffer sufficient evidence to create a genuine issue that Defendants' proffered reason is pretextual. She has failed to do so.

In order to show pretext, Trnka may (1) demonstrate that Defendants' proffered reason for her termination is "unworthy of credence" or (2) "persuad[e] the court that a [prohibited] reason more likely motivated" her termination than the proffered reason. Stallings v. Hussmann Corp., 461 F.3d 1041, 1052 (8th Cir. 2006). Stated differently,

> [a]n employee may prove pretext by demonstrating that the employer's proffered reason has no basis in fact, that the employee received a favorable review shortly before he was terminated, that similarly situated employees . . . were treated more leniently, that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies.

Id. Although Trnka attempts to prove pretext in several of these ways, her attempts fail.

Trnka first argues that other employees used company e-mail for personal use and to distribute jokes, but that those employees were not terminated. (Mem. in Opp'n at 2-3, 18.) In other words, she argues that "similarly situated" employees were treated differently from her. Yet, Trnka's employment was terminated not only because she used e-mail to send jokes and personal messages, but also because she sent *sexually inappropriate* messages from her work computer. She has proffered no evidence indicating that other employees were using their work e-mail to send sexually explicit messages. Accordingly, she has failed to identify any other employees who were "similarly situated" to her. See Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 853 (8th Cir. 2005) (noting that test for determining whether co-worker is similarly situated, at pretext stage, is "a rigorous one";

plaintiff must show that "the misconduct of more leniently disciplined employees [was] of comparable seriousness"). Moreover, there is no dispute that Defendants informed Trnka that her employment was being terminated, in part, because she repeatedly used e-mail to express her dissatisfaction with her job and to seek other employment. She has proffered no evidence that others used company e-mail in a similar fashion.

Trnka also argues that Defendants deviated from their e-mail policy when they terminated her employment, because that policy "specifically authorized personal use of company email." (Mem. in Opp'n at 1.) This argument, however, ignores that Trnka was doing more than sending personal e-mail; she was sending *sexually inappropriate* personal e-mail, and she nowhere argues (nor could she credibly argue) that such e-mail was permitted under the policy.[6] Moreover, Defendants' e-mail policy – a copy of which Trnka received at the beginning of her employment – authorized only "limited" personal use of company e-mail. (Ukabam Aff. Ex. 2 at D0151.) Defendants concluded that Trnka was sending an "inordinate" amount of personal e-mail and, accordingly, determined that her e-mailing had violated the policy. (Erickson Aff. ¶¶ 15, 19; Litman Aff. ¶¶ 5-8.) While Trnka disputes that conclusion and asserts that, if she violated the policy at all, such violation was "trivial" (see Trnka Dep. Tr. II at 180-81), the extent of her violation of the

---

[6] Trnka notes that her sexually inappropriate e-mails were directed to her husband, and she intimates (although she stops short of arguing the point in her Opposition brief) that Defendants' e-mail policy should have only been concerned with sending sexually explicit e-mails to co-workers. (Trnka Dep. Tr. II at 179-83.) The wisdom behind Defendants' policy, however, is irrelevant to Trnka's claims. See, e.g., Vaughn v. Roadway Express, Inc., 164 F.3d 1087, 1091 (8th Cir. 1998).

policy, or whether she violated the policy at all, is not the issue. All that matters is that the Defendants had a *sincere belief* that Trnka had violated the policy, see, e.g., Twymon v. Wells Fargo & Co., 462 F.3d 925, 935 (8th Cir. 2006), and Trnka has not proffered sufficient evidence to create a genuine dispute on that issue.[7]

Trnka next argues that Erickson was "hostile" toward her when she was injured on July 25, 2006, and requested to leave work. The record, however, indicates that Erickson asked Trnka to delay leaving work only because no other sales-department employees were available to cover sales calls in Trnka's absence. (Trnka Dep. Tr. I at 27; Erickson Aff. ¶ 10.) Erickson's actions, therefore, cannot reasonably be considered discriminatory. See Wagner v. Caterpillar, Inc., No. 95 C 5488, 1997 WL 45318, at *10 (N.D. Ill. Jan. 30, 1997) (fact that employer asked employee to complete work task before seeking medical attention for injury could not support a finding of discriminatory animus).

Finally, Trnka argues that Erickson and Litman were "hostile" toward her because of the frequency of her medical appointments. In support, she relies upon (1) the August 21, 2006, e-mail from Erickson asking her to attempt to schedule medical visits during non-

---

[7] Trnka also argues that discrimination is evident because Defendants (1) notified her about her improper e-mails shortly after she was hospitalized for the migraine and (2) terminated her employment because of her improper e-mails without first providing her with a warning. (See Mem. in Opp'n at 1, 5.) These contentions lack merit. The record discloses that Defendants did not become aware of Trnka's improper e-mailing until she was hospitalized, and there is no evidence before the Court to suggest that Defendants should have been aware of it earlier. That Defendants did not notify Trnka about her transgressions until immediately after her hospitalization, therefore, is not evidence of discrimination. Moreover, Trnka has failed to point to any provision of the e-mail policy that required Defendants to issue her a warning before terminating her employment for violations thereof.

working hours, (2) Litman's requests for detailed explanations of her medical appointments, and (3) the September 18, 2006, meeting with Litman and Erickson in which Trnka was asked for the prognosis for her recurring migraine. (Mem. in Opp'n at 5-6, 18.) Yet, there is nothing inherently discriminatory about any of these matters – they appear to be mere attempts by Erickson and Litman to determine when Trnka might not be in the office so that they could schedule employee coverage and manage workload, since Trnka had called in sick to work at the last minute on several occasions. (See Erickson Aff. ¶ 14.) Indeed, Trnka has acknowledged that it was not unreasonable for Defendants to ask her to schedule doctors' visits during non-working hours, so as not to interfere with the work day. (Trnka Dep. Tr. I at 83-84.) Moreover, there is no dispute that Defendants accommodated *all* of Trnka's doctors' visits, regardless of whether they occurred during the work day or during non-working hours. (Id. at 50-51.) At best, Trnka's argument boils down to her own subjective belief that these instances suggest that Defendants harbored a discriminatory animus. (See Trnka Dep. Tr. II at 184 (testifying that she believed Defendants regarded her as disabled due to her "impressions from the way they interrogated me").) This is simply insufficient to survive summary judgment. See Rose-Maston v. NME Hosps., Inc., 133 F.3d 1104, 1109 (8th Cir. 1998) (general and conclusory allegations insufficient to support inference of pretext).

Trnka also claims that Litman's failure to look at her when speaking to her is evidence of discrimination. (Trnka Dep. Tr. I at 51.) At best, this allegation suggests that Litman was rude; it does not show that Litman harbored any discriminatory animus. See

Cannice v. Norwest Bank Iowa N.A., 189 F.3d 723, 726 (8th Cir. 1999) (noting that the ADA is not "a general civility code"); Carmellino v. District 20 of N.Y.C. Dept. of Educ., No. 03 Civ. 5492, 2006 WL 2583019, at *25 (S.D.N.Y. Sept. 6, 2006) (testimony that supervisor was "not being nice" to plaintiff, including lack of eye contact, verbal abuse, dirty looks, and "lack of niceties" insufficient to support inference of discrimination; such assertions "may give rise to a reasonable inference that [the supervisor] was gruff, neglectful, or perhaps even rude in her interactions with [the plaintiff], [but] they do not support a finding that [the plaintiff's] alleged constructive discharge resulted from discriminatory animus").

Lastly, Trnka points to Defendants' deduction of 32 hours' pay from her paycheck the week after she was hospitalized as evidence of pretext. (See Mem. in Opp'n at 18.) The Court fails to see how that deduction in any way suggests discrimination by Defendants. Indeed, Trnka can only point to her subjective belief that the deduction was intended to "make [her] feel bad" as evidence that the deduction was due to discriminatory intent. (Trnka Dep. Tr. I at 70.) The record is clear that Defendants made the deduction because they had paid Trnka for her absence, but were then informed by their workers' compensation insurer that the absence would be covered by workers' compensation (see id. at 69-71; Erickson Aff. ¶ 23), and there is no dispute that Trnka was eventually compensated for the deducted time by the insurer (Trnka Dep. Tr. I at 71).

## CONCLUSION

At the end of the day, Trnka has simply "throw[n] strands of speculation on the wall [to] see if any of them will stick." Richardson v. MCF Stillwater, Civ. No. 04-4935, 2006 WL 47339, at *5 (D. Minn. Jan. 9, 2006) (Doty, J.). When viewed in the light most favorable to Trnka, she has failed to create a genuine issue as to whether Defendants' proffered reason for her termination was pretextual. Accordingly, summary judgment for Defendants is warranted.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 9) is **GRANTED** and Plaintiff's Complaint (attached to Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: January 9, 2008

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge